IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Annabelle Yao, on behalf of herself and all others similarly situated, | ) ) | |
| | ) | No.: |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge: |
| Carillon Tower/Chicago LP; | ) | |
| Forefront EB-5 Fund (ICT) LLC; | ) | |
| Tizi LLC d/b/a Local Government | ) | |
| Regional Center of Illinois; | ) | |
| TD Bank N.A.; | ) | |
| Symmetry Property Development II LLC; | ) | |
| Fordham Real Estate LLC; and | ) | |
| Jeffrey L. Laytin, | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT FOR SECURITIES FRAUD, BREACH OF CONTRACT, AND BREACH OF FIDUCIARY DUTY

### Nature of the Case

Plaintiff Annabelle Yao ("Yao") is one of ninety Chinese investors who signed investment documents totaling $49.5 million dollars to make a loan to "Carillon Tower," a to-be-realized-in-the-future 42-story tower at Superior and Wabash, housing a 200-unit Hilton hotel, 154 apartment units, a 225-seat Gibson's Restaurant, and parking spaces for 154 vehicles. The Chinese invested in 2015, but Carillon Towers was never built. It was rejected by the Alderman after a neighborhood outcry, and plans were never submitted to the Commissioner of

Planning and Development.  The Chinese investors never got their money back; in fact, no one will tell them where it is.

The structure of the deal was that the Chinese invested in a limited partnership called Carillon Tower/Chicago LP, and each of them gave $550,000 to be held in escrow by TD Bank NA ("TD").  By agreement, TD was supposed to hold the Chinese money away from the project developers (who are named as Defendants) until the LP gave notice that "the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."  This never happened, but apparently TD released the $49.5 million anyway.

This project is another EB-5 project, set up this time by a firm called Tizi LLC ("Tizi") operating as an EB-5 regional center. This Honorable Court should be familiar with the EB-5 program since the largest EB-5 fraud to date occurred in this District when the Chicago Convention Center raised $145 million from mostly Chinese investors and was shut down by the SEC and the DOJ in a case filed in this Court (Case No. 13-cv-982, Hon. Amy J. St. Eve). Recently in this Court, the SEC charged another EB-5 developer with fraud and mismanagement of funds (Case No. 17-cv-04686, Hon. Joan B. Gottschall).  In September of this year, the SEC fined a Rock Island based EB-5 regional center for issuing 37 separate funds that consisted of unregistered securities, and for dealing with unregistered broker-dealers (In the Matter of CMB Export LLC, SEC Admin. Proc. 3-18825).  A dispute with that EB-5 fund is currently proceeding in the Central District (Case No. 18-cv-4126).  This is the latest in a long string of EB-5 transactions that have led to litigation.

2

## The Parties

1.      Plaintiff Ying Yao is a Chinese national residing in China.

2.      All members of the putative Class of ninety investors are Chinese citizens.  None of the putative class members are residents of the State of Illinois.

3.      Defendant Carillon Tower/Chicago LP is a New York limited partnership (the "LP").

4.      Defendant Forefront EB-5 Fund (ICT) LLC is a New York limited liability company acting as the general partner of the LP (the "GP").

5.      Defendant Tizi LLC is an Illinois limited liability company doing business under the assumed name of Local Government Regional Center of Illinois (the "Tizi"), a regional center authorized to help developers raise money from foreigners under the EB-5 program.

6.      Defendant TD Bank N.A. is a national banking association with a principal place of business in Cherry Hill, New Jersey, and the escrow agent who, under the terms of the Offering, was required to hold the investors' money until certain conditions were satisfied ("TD").

7.      Defendant Symmetry Property Development II LLC is a New York limited liability company that, under the terms of the Offering, was to be the co-developer of the Project ("Symmetry").

8.      Defendant Fordham Real Estate LLC is an Illinois limited liability company that, under the terms of the Offering, was to be the co-developer (with Symmetry) to develop the Project ("Fordham").

3

9. Defendant Jeffrey L. Laytin is the managing member of the GP and thereby had control of the GP. He is also listed in SEC filings as the manager of Symmetry, the co-developer of the Project.

## Jurisdiction and Venue

10. Jurisdiction is proper in federal court pursuant to 28 U.S.C. 1332(a)(2) because this is a civil matter, in excess of the statutory minimum, between subjects of a foreign state (The People's Republic of China) and citizens and entities of the United States.

11. Jurisdiction is also proper in federal court pursuant to 28 U.S.C. 1331 because this action involves questions of federal law, namely whether the Defendants violated the Securities Exchange Act of 1934, 15 U.S.C. 77q(a) et seq.

12. Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) and (2) because two of the essential Defendants (Tizi and Fordham) are Illinois companies, and the subject property is located in downtown Chicago, in this district.

13. The Defendants have all purposely availed themselves of this district by setting up a development Project in this district.

## Factual Allegations Common to All Counts

14. Plaintiff Yao and other class members were solicited and marketed by Tizi and its overseas agents in China to invest in an EB-5 project that would offer the promise of an eventual green card by investment in a project that generated 10 jobs per investor.

4

15.    Plaintiff Yao and others were provided with brochures marked "Forefront Capital" and "Forefront EB-5 Fund" which described an EB-5 investment into a building that would supposedly be built in downtown Chicago.

16.    Plaintiff Yao and others invested pursuant to a document styled "Confidential Private Offering Memorandum dated January 15, 2015" (the "PPM"), attached as Exhibit 1.

17.    The vast majority of Plaintiffs cannot speak or read English, and those that can cannot read or write beyond the elementary school level.  As part of the Offering, a copy and the PPM, translated into their native language (Mandarin Chinese), was never provided to any plaintiff or any putative class member before they were asked to sign the execution pages of the PPM.

18.    Although the PPM stipulates that English controls and that investors are responsible for hiring a translator, the cost of translating a document of this size and complexity is prohibitive and the investor relies mainly on the fiduciary obligation of the mangers to ensure that they will be treated fairly.

19.    The PPM is an aggregate document in pdf format that contains a number of interconnected documents: a subscription agreement in favor of the GP with instructions for the Plaintiffs to wire the $550,000 into an escrow at TD ("Subscription Agreement"); a limited partnership agreement whereby each Plaintiff agrees to be a limited partner in the LP ("LP Agreement"); and an Escrow Agreement between the LP and TD ("Escrow Agreement"). Copies of such

documents are contained within Exhibit 1 and referred to herein as the "Investment Documents."

20.    Plaintiff Yao's payment of $550,000 was acknowledged in a confirmation letter dated September 17, 2015, from the Vice President of TD to Jeffrey Laytin as manager of the GP and the LP, attached as Exhibit 2.  Upon information and belief, a similar letter was used to acknowledge the same investment by each putative class member.

21.    Page 3 of the PPM provides that Symmetry and Fordham will work together in the "acquisition, construction, and development of the real property located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook County, Illinois to be known as the Carillon Tower, a 42 story tower housing a 200-room hotel operating under the Canopy by Hilton brand, 154 luxury apartment units, a 225 seat restaurant operated by Gibson's Restaurant Group, and parking space for 154 vehicles (collectively, the "Project").

22.    The "Project" was meant to be over 40 stories, over 700 feet tall, with a Hilton Hotel, apartment units, a Gibson's Restaurant, and parking.  That is what the investors were sold.

23.    The PPM at page 8 provides that each investor agrees to place $550,000 of their own funds into an escrow account with TD.  TD was then to release $50,000 of each investor's escrow funds to the LP immediately as an "Administrative Fee" for putting the deal together, and would hold the remaining

$500,000 as a "Capital Contribution" until the "Holdback Trigger" had been satisfied.

24.     The Holdback Trigger is defined as follows on page 8 of the PPM and similarly throughout the Investment Documents:

"* USCIS has approved the Form I-526 Petition of one Subscriber for a Unit in the Offering; and

* The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

25.     The second condition of the Holdback Trigger is that the LP must provide evidence of **formally** submitting the **Project** plan to the **Chicago Commissioner**.  This condition has never been met and can never be met as the Project has been shut down permanently due to, in part, unresolvable community objections.

26.     Exhibit B to the Subscription Agreement is styled "Summary of Escrow Procedures" and it provides at Section G (pg. 161) that the Holdback Trigger requires that "the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

27.     The Escrow Agreement itself (page 165) provides that TD will release the funds from escrow only upon notification from the LP that the Holdback Trigger has been satisfied.

28.     Further, the Escrow Agreement provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors.

29.     The trigger for the entire Project – the entire basis on which the Defendants took $550,000 from the Plaintiffs -- was that a formal plan was going to be submitted to the Commissioner of Planning and Development.

30.     On information and belief, an employee and/or agent of TD was informed that the Holdback Trigger for the Project had been satisfied.

31.     On information and belief, an employee and/or agent of the LP was informed that the Holdback Trigger for the Project had been satisfied.

32.     Upon information and belief, an employee and/or agent of the GP was informed that the Holdback Trigger for the Project had been satisfied.

33.     Upon information and belief, an employee and/or agent of Tizi was informed that the Holdback Trigger for the Project had been satisfied.

34.     Upon information and belief, an employee and/or agent of Symmetry was informed that the Holdback Trigger for the Project had been satisfied.

35.     Upon information and belief, an employee and/or agent of Fordham was informed that the Holdback Trigger for the Project had been satisfied.

36.     Upon information and belief, TD has released to the LP the $50,000 Administrative Fee from each investor (totaling $4.5 million) even though there is nothing to "administer" because there is no Project, and even though the Escrow Agreement provides that if the Holdback Trigger is not satisfied, the $50,000 must be returned to each investor.

37.    On information and belief, TD has released some and/or all of the $500,000 capital funds invested by the Plaintiff and each putative class member to the LP.

38.    Upon information and belief, the GP has transferred some and/or all of the $500,000 capital funds invested by the Plaintiff and each of the putative class members from the LP fund to defendants Symmetry and/or Fordham.

39.    The Offering documents create a loop of self-dealing: Defendant Laytin, as manager of the GP, can cause the LP to notify TD that the Holdback Trigger has been met, thereby causing the release of the Capital Contributions money to Symmetry, which is also managed by Laytin.

40.    The Project plan was not submitted to the City Commissioner.

41.    A prerequisite for submitting a Plan to the City Commissioner was that the local Alderman (in this case, the 42nd Ward Alderman Brendan Reilly) first has to provide support and approval of the Project plan on behalf of his constituency.

42.    Alderman Brendan Reilly rejected the Project plan and did not provide the necessary approval for the Holdback Trigger, based in part on strong community objections to the Project related to, amongst other things, exacerbation of traffic congestion and disruption of the pickup/drop-off for a nearby school.

43.    On information and belief, Alderman Reilly has never approved the Carillon Tower Project, or any similar structure formal submission of a plan, relating to the Project as required to satisfy the Holdback Trigger.

44.    This investment was made by Plaintiff and each of the putative class members in 2015.    The PPM says at page 5 that "The construction period is expected to take 24 months and is projected to be completed in October 2017, assuming construction commences in October 2015."

45.    The condition precedent for the release of capital contribution funds held in escrow by TD to the Project GP never happened.

46.    "The Project" as defined under the PPM does not exist and will never exist in the form described in the PPM.

47.    The refund provisions of the Investment Documents are triggered and the investment funds must be returned in full to the Plaintiff and putative class members.

48.    The PPM at page 24 (page 32 of the pdf) states that the LP is supposed to make a loan to Symmetry to fund the Project after the Holdback Trigger is met: "The first advance of the Project Loan will fund *after the Holdback Trigger is met.*" (emphasis added).

49.    Pursuant to the terms of the PPM, if the Holdback Trigger was never satisfied, TD would not have the authority to release investor funds to the LP or GP.

50.    Pursuant to the terms of the PPM, if the Holdback Trigger is not satisfied, the GP has no authority to fund any loan or otherwise transfer investor funds out of the LP fund.

51. Plaintiff has attempted to obtain her $550,000 investment funds from the defendants amicably, both via phone requests and formal written communications, to no avail.

52. Each putative class member investor has lost $550,000, plus accrued interest, costs, and counsel fees, as a result of the wrongful release and disbursement of the TD escrow account funds by Defendants and each of them.

<u>Class Action Allegations</u>

53. Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

54. This action is maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

55. **Class Definition.** The class definition shall be:

All foreign investors who paid $550,000 into the EB-5 fund relating to Carillon Tower/Chicago LP and whose money was placed in the escrow account for that Project and who have not received a full refund of their $550,000 investment.

56. All members of the Class were and are similarly affected and deceived by the failure of the unlicensed brokers to register.

57. **Numerosity.** Plaintiff's counsel believes that the number of Plaintiffs is 90, who are residents of China, making joinder impracticable.  The LP and its GP have records of such persons (their contact, banking and immigration application information), such records will allow the putative class members be notified on the pendency of this action by Court-approved dissemination methods such as US Mail, electronic mail, Internet postings, and publication and, if the plaintiffs are the

prevailing parties in this action, will also facilitate the transfer of the settlement and/or judgment proceeds to the Plaintiff and putative class members.

58. **Common Questions of Law and Fact Predominate.** Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. These common questions of law and fact include:

      i)      Whether Plaintiffs are entitled to a return of their money under the PPM and the Investment Documents; and

      ii)      Whether Defendant's have violated any federal or state securities laws by failing to comply with the provisions of the Investment Documents; and

      iii)      Whether (and to what extent) the Defendants have committed federal or state law offenses relating to transfers of money; and

      iv)      Whether one or more Defendants has breached one or more of the Investment Documents; and

      v)      Whether any of the Defendants and/or other individuals aided and abetted the commission of a

fraud or the conversion of the investment funds; and

vi)    Whether any of the Defendants (or others) owed a fiduciary duty to the plaintiffs and class members; and

vii)    Whether any of the Defendants (or others) breached their fiduciary duty to plaintiffs and the class members by way of material omissions and/or misrepresentations associated with the Offering and/or the release of the Holdback Trigger.

59.    **Typicality.**    The facts surrounding the investment by Plaintiff are typical of what happened with the other investors/putative class members, as they arose from the same offering and course of conduct by the Defendants.

60.    The Defendants operated under a scheme and practice to wrongfully and/or fraudulently deprive the Plaintiff and the putative class of their investment monies.

61.    **Adequacy.**    The Plaintiff has no conflict of interest or unusual fact pattern that would render her an inadequate class representative.    Plaintiff's counsel has conducted numerous class actions in this district and other federal courts.

62.    **Predominance and Superiority of Class Action.**  Given the commonality of the issues affecting each investor, which easily predominate over any minor

differences, the class action is a superior method of deciding this matter versus case-by-case adjudication.  As the recovery requested by each investor is small, and is mostly a return of their own money, judicial efficiency favors the class action as a method.

## COUNT I
### (against Laytin, GP, LP, and Symmetry)
### 15 U.S.C. 78j (17 CFR. 240.10b-5)
### Federal Exchange Act Violation

63.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

64.    Section 10b of the Exchange Act (15 U.S.C. 78j) provides that it shall be unlawful for any person, directly or indirectly, to use any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe for the protection of investors.

65.    In furtherance of Rule 10(b), the Commission enacted Rule 10b-5 (17 CFR 240.10b-5) which makes clear that it is unlawful to (a) employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact, or (c) to engage in any act, practice or course of business which operates as a fraud or deceit on any person, in connection with the purchase and sale of a security.

66.    A "material fact" under Rule 10b-5 is any fact that a reasonable investor would find important in making a decision whether to invest.

67.    Tizi – as the regional center structuring the deal - and the LP (through the GP) caused the PPM and Investor Documents to be drafted and disseminated to

the Plaintiffs, and caused the Escrow Agreement to be entered into between the LP and TD.

68.    The Investment Documents worked a fraud and deceit on the Plaintiffs because their money was moved out of escrow despite the Investment Documents stating that if the Holdback Trigger is not satisfied, the money will come back in full to the investors.

69.    Therefore, the Investment documents were violated and this worked a fraud on the Plaintiffs.

70.    This is a material breach of the Investment Documents.

71.    The Plaintiffs relied upon the Investment Documents in making their investment.

72.    The promises made in the Investment Documents were not fulfilled by the Defendants, causing specific and quantifiable harm to the Plaintiffs, and the Defendants are jointly and severally liable for damages caused.

73.    The LP and its GP had a duty to inform the Plaintiffs that the Holdback Trigger had not been met and that the schedule set forth in the PPM had become stale and misleading.  Their failure to make this disclosure is an omission to state a material fact in connection with a security.

74.    The Defendants acted with scienter, in full knowledge of the fact that no formal Project plan had been submitted as required.

75.    The Defendants had a duty to prominently disclose potentially outcome determinative risks and material facts to the success or failure of the Project.

76.    Defendants failed to prominently disclose the fact that, based on long standing policy and procedure for all development in the City of Chicago, and the Defendants knowledge of such policy and procedure, the Project required Alderman/Ward approval prior to the submission of a Project plan to the City Commissioner of Development and Planning, and that the submission of any Project plan to the City Commissioner without such Alderman/Ward approval would result in rejection by the Commissioner and failure of the Project.

77.    The loss causation here is easily quantifiable: each investor has lost $550,000 plus interest, and has incurred translation fees, costs, and attorney fees to obtain recovery.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

### COUNT II
### (against Laytin, GP, LP, and Symmetry)
### 815 ILCS 5/8 et seq.
### Illinois Securities Act Violation

78.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

79.    Section 2.4 of the Illinois Securities Act defines "Controlling Person" as follows: "In case of unincorporated issuers, "controlling person" means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security, who directly or indirectly controls the activities of the issuer.

80.     Under this definition, all of the Defendants listed in this Count are Controlling Persons of the LP which issued the securities.

81.     Sections 12F and 12G of the Illinois Securities Act track the Federal Rule 10b-5 and creates liability for any persons who make any misstatements of material fact or omissions of material fact.  815 ILCS 5/12.

82.     Section 13 of the Illinois Securities Act requires payment by Controlling Persons of the amount lost plus 10% per annum in interest for violation of the anti-fraud provision.

83.     The securities in this case are the LP interests offered in collaboration by the Defendants.

84.     The securities were issued pursuant to arrangements by Tizi, an Illinois company, with respect to a project in Illinois, to be built by a co-developer in Illinois.  There is a strong nexus with Illinois.

85.     If the Illinois Securities Act does not apply because the GP and LP are based in New York, then the applicable law will be the legendary New York Martin Act which is even stronger than the Illinois law.  Plaintiffs assert a violation of the Illinois Securities Act, but if the Defendants insist on the Martin Act, then Plaintiffs will be happy to accommodate them in an amended pleading.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of 10% annual interest, costs and attorney fees.

<u>Count III</u>
(against Laytin, GP and LP)
Breach of Contract of LP Agreement

86.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

87.     The LP Agreement defines "Project" as Carillon Tower, which never came to exist.

88.     Appendix 1 of the LP Agreement stipulates that the LP shall request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

89.     The Holdback Trigger was not satisfied.

90.     TD was holding onto $49.5 million of investor funds ($550,000 times 90 investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

91.     The LP, acting through the GP and Laytin, breached the LP Agreement by wrongfully – with scienter and full knowledge of falsity – informing TD that the Holdback Trigger had been satisfied.

92.     This wrongful action by the LP, in violation of the LP Agreement and the Investment Documents, caused quantifiable detriment to the Plaintiffs by having their funds dispersed to an idle Project.

93.     As a result of this breach, Plaintiffs' funds were unlawfully converted by the GP and LP.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to

the LP and to any Defendant, with an award of costs and attorney fees.

## Count IV
### (against TD)
### Breach of Contract of Escrow Agreement

94.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

95.    The LP was party to that certain Escrow Agreement with TD included in the Investment Documents.

96.    The Plaintiffs were not a nominal party to the Escrow Agreement, but they became a party to it by virtue of signing the Subscription Agreement, which contained escrow instructions which were signed by each investor, directing that the investment o $550,000 be sent to TD Wealth Management for Defendant TD Bank NA.

97.    The Escrow Agreement – though nominally between TD and the LP – was only possible because the Plaintiffs (as limited partners of the LP) put their money into escrow with TD in the first place.

98.    The Escrow Agreement has a section called "Action Upon Achievement of Holdback Trigger" which stipulates that TD will release the investor Capital Contributions (aggregate of $45 million) only upon notification from the LP that the Holdback Trigger has been satisfied.

99.    Further, the Escrow Agreement has a section called "Action Upon Termination or Cancellation of the Offering" which provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors.

100.    In compliance with the Escrow Agreement, Plaintiff Yao and other investors sent $550,000 to TD, as evidenced by the letter attached as Exhibit 2.

101.    The Escrow Agreement and the LP Agreement stipulates that the LP may request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

102.    The Holdback Trigger was not satisfied.

103.    TD was holding onto $49.5 million of investor funds ($550,000 times 90 investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

104.    TD breached the Escrow Agreement by wrongfully releasing the Plaintiffs' funds even though the condition specified for such release had not been satisfied.

105.    TD had a duty prior to release of the investors' funds to demand adequate documentation showing that a Project plan had been formally submitted to the Commissioner of Planning and Development for the City of Chicago.

106.    TD negligently released the funds from escrow without reviewing the requisite documents and without doing proper due diligence, falling short of its contractual obligations and a basic standard of care.

107.    TD's failure to observe a basic standard of care in its duty to investors caused damage to the investors both immediately and proximately, in the quantifiable amount of $49 million.

108.    The Plaintiffs were a direct participant in the TD-LP contract because

the Subscription Agreement required them to submit investment funds subject to the TD-LP Agreement, making them a third party beneficiary of such contract, and certainly within the zone of persons to whom TD owed a duty of professional conduct, which they breached.

109.    As a result of TD's negligent breach, Plaintiffs' funds were unlawfully converted.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count V
### (against all Defendants)
### Fraud

110.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

111.    Tizi – with full knowledge and cooperation of the GP, LP, Symmetry, a and Fordham – marketed the Project to Chinese investors through Kaisheng Emigration Company (English name "Cansine" and their web site which is in Chinese is at www.cansine.com)

112.    The web site claims the Project (referred to in English as the Hilton) is "100% safe." See Exhibit 4. (last visited November 22, 2018).

113.    The web site implies that the Project is active, alive, and ongoing. It omits any statement about the failure to submit a Project plan to the City of Chicago Commissioner of Planning and Development.

21

114.    The web site says that each investor has full third party insurance to obtain a return of their money if they are not eligible for a green card due to events beyond their control.

115.    The web site is a public proclamation that benefits each of the Defendants.

116.    It contains the material misstatement that the Project is 100% safe, which is impossible for any investment, and which would disqualify the Project for EB-5 since the program requires that investors place capital "at risk."

117.    The web site fails to disclose material facts about the Project being slowed and dead.

118.    The Plaintiff and others relied on the web page since they speak Chinese and the web page is in Chinese.

119.    This reliance caused them to believe that the Project was still active. This caused damage for failure to take action to obtain recovery.

120.    The failure to inform investors of the truth was a ploy to drain their assets and to get more time to slap something together at the last minute as an excuse for not returning the money.

121.    The benefit of this fraud inured to all defendants: it gave them money and time, and violated the fiduciary duties owed to the investors.

122.    Defendants are jointly and severally liable for this fraud on the investors.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

## Count VI
### (against Laytin, the GP and LP)
### Breach of Fiduciary Duty

123.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

124.    The GP has a fiduciary duty to keep the limited partners fully informed of all material developments in the Project.

125.    This duty is separate and distinct from their contractual duty to limited partners.

126.    The GP and Laytin (as controlling person of the GP) knew as early as April 2017 that the Project had been denied.

127.    This created a duty to inform limited partners and to make clear their remedy to obtain a return of investment due to failure of condition precedent for the project.

128.    The duties violated include the duty of care, the duty of loyalty (no self-dealing) and the duty of good faith and fair dealing.

129.    Plaintiff Yao and investors have suffered for the failure of the GP, the LP, and Laytin to comply with their fiduciary duties.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

## Count VII
### (against all Defendants)
### Appointment of Third-Party Administrator

130.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

131.    The practical question remains how the money in this case will be rightfully returned to the Chinese investors in full, accounting for interest, fees, costs, and other expenses.

132.    The Chicago Convention Center Eb-5 lawsuit heard in this Court by Justice St. Eve is instructive.

133.    That case involved a massive fraud whereby investors put their money into a project that did not actually exist – it was a fake, no shovel was ever put into the ground.  The SEC brought suit under Rule 10b-5 and they won disgorgement of the investment back to the Chinese investors.  The practical question for the Court became how to get the money back to the investors.

134.    As a remedy, Justice St. Eve appointed a neutral third party to conduct an accounting, receive the disgorged funds and the fines, to make deductions for fees and costs, and to make sure that each investor got his or her proportional share.  See "Order to Appoint a Distribution Agent," *SEC v. A Chicago Convention Center LLC*, 13-cv-00982 (January 31, 2018).

135.    The same process can be used in this case.

136.    At present, the Plaintiffs do not have any idea where their money is

24

located.  They are in need of an accounting from the LP, and a disgorgement or fine that can be placed with a neutral third party for accounting.

137.  The remedy of constructive trust is recognized in this Court and in Illinois

for situations where one party wrongfully holds the property of another.

WHEREFORE, the Plaintiffs demand a (i) full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees, and (ii) the Court appointment of an administrator / trustee / distribution agent to collect all refunded money (by way of disgorgement or damages) and to perform a complete accounting of the escrow fund.

Dated:         November  28, 2018

Respectfully Submitted,

/s/ Glen J. Dunn, Jr.

Glen J. Dunn, Jr.                            Douglas Litowitz
Glen J. Dunn & Associates, Ltd.              Attorney at Law
221 N. LaSalle Street                        413 Locust Place
Suite 1414                                   Deerfield, IL 60015
Chicago, Illinois 60601                      (312) 622-2848
(312) 880-1010                               Litowitz@gmail.com
gdunn@gjdlaw.com